0782

Karl A. FOLKENS, Robert H. Moore, and Douglas D. Cooke, as Executors of the Estate of M. Murray McLendon, Jr., Appellants v. J. W. HUNT, Jr., J. W. Hunt, R. L. Davis, W. R. Hunt, B. L. Davis, P. R. Johnson, Z. V. Smith and Michael S. Strange, individually and d/b/a J. W. Hunt & Co., a South Carolina General Partnership, Respondents.

(348 S. E. (2d) 839)

Court of Appeals

*Ronald E. Boston,* of *Turner, Padget, Graham & Laney,* Columbia, *R. Wayne Byrd,* of *Scott & Byrd,* and *Karl A. Folkens,* Florence, *for appellants.*

*Kirkman Finlay, Jr., Manton M. Grier* and *Walter W. Theus, Jr.,* of *Boyd, Knowlton, Tate & Finlay,* Columbia, *for respondents.*

Aug. 25, 1986.

GOOLSBY, Judge:

M. Murray McLendon, Jr.,[1] individually and as a partner in Shodon Properties, brought this action alleging causes of action for accounting malpractice, fraud, intentional infliction of emotional distress, and a violation of the South Carolina Unfair Trade Practices Act. He brought this action against the partners of J. W. Hunt & Co., an accounting firm. The circuit court granted summary judgment to Hunt & Co. on all causes of action. McLendon appeals, contending that the grant of summary judgment on each cause of action was inappropriate and that the hearing judge abused his discretion in refusing to consider an affidavit submitted by him on the first day of a two-day hearing on Hunt & Co.'s summary judgment motion. We affirm in part and reverse in part.

Under South Carolina Circuit Court Rule 44(c), as under the new rule [*see* S.C.R. CIV.P. 56(c)], summary judgment may be rendered only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Spencer v. Miller,* 259 S. C. 453, 192 S. E. (2d) 863 (1972). Additionally, it must be shown that further inquiry into the facts of the case is not desirable to clarify the application of the law. *Abrams v. Wright,* 262 S. C. 141, 202 S. E. (2d) 859 (1974). In ruling upon a motion for summary judgment, the hearing judge must construe all ambiguities, conclusions, and inferences arising in and from the evidence most strongly against the moving

---

[1] McLendon died during the pendency of this appeal. The executors of his estate have been substituted as the named appellants in this action.

party. *Tom Jenkins Realty, Inc. v. Hilton,* 278 S. C. 624, 300 S. E. (2d) 594 (1983).

With these general principles in mind, we turn now to McLendon's contentions. As we do so, we view the evidence contained in the depositions, exhibits, and affidavits of record and all the reasonable inferences arising therefrom in the light most strongly against Hunt & Co.

In 1976, McLendon and Wellman formed a partnership called Shodon Properties. McLendon served as its managing partner.

The partnership agreement provided that "[a]ll capital contributions to the partnership have been and will hereafter be made by each partner in equal amounts." McLendon and Wellman both understood that Wellman's capital contribution would be cash in the amount of $310,000 and that McLendon's capital contribution would be a 391-acre tract of land known as Kelly Farms. Both parties considered these contributions to be of equal value.

In early 1979, Wellman told McLendon that he wanted Hunt & Co. to review the books of the partnership "due to the fact that [he] did not want to have any IRS problems . . . and . . . [he] wanted to make sure that everything was being handled in a businesslike fashion. . . ." Hunt & Co. provided accounting services to Wellman personally and helped prepare Wellman's personal income tax returns for several years prior to 1979.

McLendon agreed, as a personal favor to Wellman, to have Hunt & Co. examine the partnership's books. McLendon made the arrangements to switch from the accounting firm that had previously handled the partnership's affairs.

On December 13, 1979, J. W. "Jim" Hunt, Jr., a staff accountant with Hunt & Co., went to the offices of Shodon Properties in Lake City to examine the partnership books. He remained there for two days.

On the first day Jim Hunt was in Lake City, he noticed a discrepancy between a listing of the partnership's property provided by McLendon and a listing of the property included on the partnership's general ledger land account. Kelly Farms appeared on the general ledger land account but not on the list furnished by McLendon.

Jim Hunt confronted McLendon about the discrepancy in

the presence of McLendon's secretary, Brenda Matthews. Jim Hunt asserted that, while Wellman had contributed money to the partnership, McLendon had not made any capital contribution thereto. He pointed to McLendon's failure to deed Kelly Farms to Shodon Properties.

McLendon responded by saying that he and Wellman had agreed that Kelly Farms would represent his capital contribution.

Jim Hunt became verbally abusive and accused McLendon of owing hundreds of thousands of dollars in taxes and of filing fraudulent tax returns. He told McLendon that McLendon "could be looking at ... jail."

Jim Hunt's accusations upset and shocked McLendon. He immediately offered to deed Kelly Farms to the partnership. Jim Hunt, however, said it was too late.

In response to a telephone call from Wellman on the morning of December 15, 1979, McLendon met later that day with Wellman, Bruce Hunt of Hunt & Co., and Jim Hunt in Columbia at Hunt & Co's office.

At the meeting, Hunt explained what he perceived to be the problem. Wellman expressed concern about McLendon's failure to make a capital contribution. The parties discussed the alternatives available to Wellman and McLendon and finally decided that Wellman should withdraw his capital contribution and that McLendon should pay Wellman interest thereon. Jim Hunt led the discussions and advised Wellman and McLendon regarding what they should do.

A letter agreement was later prepared on Jim Hunt's stationery. The agreement, dated February 1, 1980, was signed by both partners. It provided that the partnership would pay Wellman the sum of $440,149.32 on February 11, 1980. The amount included "the interest due to ... Wellman on the principal amounts of funds for which he had capital funds in excess of [McLendon's] capital accounts."

Shodon Properties thereafter distributed the money to Wellman pursuant to the letter agreement.

McLendon continued to work with Wellman; however, their relationship became increasingly strained. They later ended their partnership.

Before December, 1979, McLendon enjoyed good health. In 1981, however, he began to see a psychiatrist. He "started going to pieces." In fact, he withdrew from all activities and

"just sat home." McLendon attributed this withdrawal and mental deterioration to the interruption of his relationship with Wellman and to the fact that he "[had] never, ever, been accused of being crooked or dishonest."

## I.

McLendon contends that the hearing judge erred in granting summary judgment to Hunt & Co. on this cause of action for accounting malpractice. He argues there are genuine issues of material fact regarding whether Hunt & Co. rendered negligent accounting advice to him as a partner in Shodon Properties and whether this advice proximately caused disbursements to be made to Wellman from the partnership account.

In granting Hunt & Co. summary judgment on the cause of action alleging accounting malpractice, the hearing judge ruled that Hunt & Co. was obligated to raise the issue of whether Kelly Farms was contributed as an asset to the partnership, that it had raised the issue in a reasonable manner, and that, while an issue of fact existed concerning whether McLendon had contributed Kelly Farms to the partnership as a capital asset, the question of whether he made the contribution was immaterial.

As a further ground for granting summary judgment to Hunt & Co. on McLendon's accounting malpractice claim, the hearing judge found that there was no genuine issue of material fact as to the fact that, when the status of Kelly Farms was raised, Wellman was a fifty percent partner in Shodon Properties and, as a matter of partnership law, had the right to require that the equities of each partner reflect his fifty percent interest. He apparently held that Hunt & Co.'s advice concerning the status of Kelly Farms was not the proximate cause of the issuance of $440,149.32 to Wellman from the partnership account.

Generally, negligence claims are not susceptible of summary adjudication because of the many questions normally present in such cases concerning the reasonableness of a party's conduct, foreseeability, and proximate cause. 6-Pt. 2 *Moore's Federal Practice* § 56.17[42] at 56-946 (1985); *see* 65A C. J. S. *Negligence* § 251(1) at 778 (1966). Actionable negligence consists of a duty on the part of the defendant, a breach of that duty, and an injury to the

plaintiff resulting from the defendant's breach. *Winburn v. INA*, 287 S. C. 435, 339 S. E. (2d) 142 (Ct. App. 1985).

A public accountant who fails to perform in accordance with accepted professional standards may be liable in tort to his client for his negligence. 65 C. J. S. *Negligence* § 94 at 1052 (1966). The standard of care and the public accountant's departure therefrom must ordinarily be established by expert testimony. *Kemmerlin v. Wingate*, 274 S. C. 62, 261 S. E. (2d) 50 (1979).

The same standard of care applicable to other professionals who furnish skilled services for compensation is applicable to public accountants and that standard is reasonable care and competence. *Id.* In this context, reasonable care and competence means that public accountants "will render their services with that degree of skill, care, knowledge, and judgment usually possessed and exercised by members of that profession . . . in accordance with accepted professional standards and in good faith without fraud or collusion." Annot., 92 A. L. R. (3d) 396, 400 (1979); *cf. King v. Williams*, 276 S. C. 478, 279 S. E. (2d) 618 (1981) (wherein the court held that the standard of care which a physician or dentist must meet is not limited to the practice or custom of the particular locality).

Specifically, a public accountant must exercise the care and competence reasonably expected of persons in his or her profession (1) to ascertain the facts on which his or her report is made; (2) to draw inferences from facts not stated in his or her report; and (3) to communicate the information so that it may be understood. C. Hawkins, *Professional Negligence Liability of Public Accountants*, 12 VAND. L.R. 797, 803 (1959).

In ascertaining the facts, the public accountant must make reasonable inquiry. *See In re London & General Bank (No. 2)*, 2 Ch. 673, 682-83 (1895). In some circumstances, reasonable inquiry into the facts might well require the public accountant to ascertain the applicable law.

We do not agree with the hearing judge that the issue here is whether Hunt & Co. had an obligation to the partners to raise the question of whether Kelly Farms had been contributed as a capital asset to Shodon Properties; rather, we think the issue is simply whether Hunt & Co. committed professional malpractice in advising the partners

that Kelly Farms was not a capital asset of the partnership without Hunt & Co. making reasonable inquiry in ascertaining the facts on which it based its advice.

We think a genuine issue of material fact exists as to whether Hunt & Co. breached its duty to render reasonable and competent services to McLendon as a partner of Shodon Properties regarding the status of Kelly Farms as a capital asset of the partnership. There is evidence that the opinion given by Jim Hunt, i.e., that Kelly Farms could not be considered an asset of Shodon Properties unless McLendon formally deeded it to the partnership, was incorrect and made without appropriate research and proper investigation.

Robert C. Crim, a Certified Public Accountant and the accountant who handled the books for Shodon Properties before Hunt & Co. undertook to examine them, testified at his deposition that he researched the question of capital contributions at the time he set up the partnership for Wellman and McLendon and that he understood from his research that property could be used "as a partner's capital contribution without transferring the title." His affidavit states that it was his "distinct understanding ... that Kelly Farms was ... McLendon's capital contribution to the Partnership" and that the property had a value of at least $310,000.

In response to a hypothetical question, Crim offered his expert opinion that the accusations Jim Hunt made against McLendon and the advice Jim Hunt gave McLendon were improper, given all Crim knew about the formation of Shodon Properties. The clear implication of Crim's testimony at deposition is that if Hunt & Co. had conducted an investigation into the origin of the partnership and had researched the law regarding partnership property it could have avoided reaching the erroneous conclusion that Kelly Farms had not been contributed by McLendon to the partnership.

The record before us contains numerous indications that Jim Hunt failed to make reasonable inquiry in ascertaining the facts concerning the status of Kelly Farms as a partnership asset.

For instance, Crim understood that all income produced and expenses incurred by Kelly Farms were to be trans-

ferred to Shodon Properties. He knew, and indeed the public records at the Williamsburg County Court House reflected, that Kelly Farms was used as collateral for a Federal Land Bank loan made to Shodon Properties. Hunt & Co. never inquired of Crim about these matters and about Crim's understanding of the intention of the partners concerning Kelly Farms.

Jim Hunt looked to record title and little else, if anything, in reaching his conclusion, even though it is generally held that whether particular property constitutes partnership property depends upon the intention of the partners. *Klingstein v. Rockingham National Bank of Harrisonburg*, 165 Va. 275, 182 S. E. 115 (1935). He was required to do more under the circumstances.

Regarding the hearing judge's apparent holding that Hunt & Co.'s advice concerning the status of Kelly Farms was not the proximate cause of the distribution of $440,149.32 to Wellman from the partnership account because Wellman "had a right to require that the equities of each partner in Shodon Properties reflect his fifty percent interest," this holding, as Hunt & Co. recognizes in its brief, is premised upon the assertion that Hunt had the duty to raise the issue of Kelly Farms' status as a partnership asset.

This holding, however, completely ignores the fact that Hunt & Co. had the duty to do more than that. It also had the duty, as we pointed out above, to make proper inquiry. Whether the partners would have executed the February 1, 1980 agreement and would have distributed nearly a half million dollars to Wellman but for the advice of Hunt & Co., like most questions of proximate cause [*see Davenport v. Walker*, 280 S. C. 588, 313 S. E. (2d) 354 (Ct. App. 1984)], presents an issue of fact for a jury to determine.

In fact, McLendon testified that he entered into the February 1, 1980 agreement only because of Hunt & Co.'s advice and accusations. He felt he had no other choice.

Furthermore, Hunt & Co. offered no evidence that Wellman would have insisted, as he had a right to do, on a return of his capital investment and would have demanded, as he may or may not have had a right to do, that interest be paid thereon were it not for Hunt & Co.'s advice.

The hearing judge, therefore, improperly granted Hunt & Co. summary judgment on McLendon's cause of action alleging accounting malpractice.

## II.

McLendon next argues that the hearing judge erred in granting summary judgment to Hunt & Co. on his cause of action for intentional infliction of emotional distress.

The hearing judge granted Hunt & Co. summary judgment on the cause of action alleging intentional infliction of emotional distress because he did not view Jim Hunt's conduct as meeting the standard of outrageousness that the law requires.

The tort of intentional infliction of emotional distress, or outrage, was first recognized in South Carolina in *Ford v. Hutson*, 276 S. C. 157, 276 S. E. (2d) 776 (1981). In order to recover on a cause of action alleging outrage, the plaintiff must show that

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct ... ; (2) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as 'atrocious, and utterly intolerable in a civilized community' ... ; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "severe" so that "no reasonable man could be expected to endure it."

276 S. C. at 162, 276 S. E. (2d) at 778.

The question of whether a defendant's conduct may be reasonably regarded as so extreme and outrageous as to permit recovery is one for the court to determine in the first instance. *Todd v. South Carolina Farm Bureau Mutual Insurance Co.*, 283 S. C. 155, 321 S. E. (2d) 602 (Ct. App. 1984), *quashed in part on other grounds*, 287 S. C. 190, 336 S. E. (2d) 472 (1985).

Although "[c]onduct growing out of a business relationship may be so outrageous and shocking as to be actionable" [*Ford v. Hutson*, 276 S. C. at 166, 276 S. E. (2d) at 780], not all conduct involving personal interaction and causing emotional distress in a business setting may serve as a basis for an action alleging outrage. *Save Charleston Foundation v. Murray*, 286 S. C. 170, 333 S. E. (2d) 60 (Ct. App. 1985). This is particularly true where the law affords another means of redress. *Id.; Todd v. South Carolina Farm*

*Bureau Mutual Insurance Co., supra.*

We cannot say, when we view the evidence and all its ■ inferences in the light most favorable to McLendon, that Jim Hunt's conduct here "was so 'extreme and outrageous' as to exceed 'all possible bounds of decency' and [was] 'atrocious, and utterly intolerable in a civilized community.' " *Ford v. Hutson,* 276 S. C. at 162, 276 S. E. (2d) at 778.

Moreover, Jim Hunt's conduct did not involve excessive self-help in either asserting a legal right or avoiding a legal obligation that arose out of their pre-existing legal relationship, one of three factors often present where liability for intentional infliction of emotional distress has been found. *See Todd v. South Carolina Farm Bureau Mutual Insurance Co.,* 283 S. C. at 169, 321 S. E. (2d) at 610-11; *cf. Bell v. Dixie Furniture Company, Inc.,* 285 S. C. 263, 329 S. E. (2d) 431 (1985) (a case where a creditor threatened a debtor in an attempt to have the debtor pay unawarded court costs in addition to a judgment obtained by the creditor in the magistrate's court).

At most, Jim Hunt defamed McLendon by making false accusations of criminal conduct. Such conduct, obviously, can give rise to a claim for slander, the usual remedy to be employed against one who publishes a falsehood about another person. *Cf. Smith v. Phoenix Furniture Company,* 339 F. Supp. 969 (D.S.C. 1972) (words are actionable *per se* in South Carolina when they falsely or maliciously charge a person with the commission of a crime or distinctly imply that one has committed a crime).

We do not ignore *Hensley v. Heavrin,* 277 S. C. 86, 282 S. E. (2d) 854 (1981), a case, like the one here, in which a professional allegedly gave incorrect advice to a client and the client allegedly suffered severe emotional distress as a result. There, the complaint alleged that a physician caused a patient to suffer "extreme anguish and mental distress" as a result of being incorrectly and, according to the record of the case, recklessly advised that she had a venereal disease. Unlike this case, however, *Hensley* came before the Supreme Court on an order overruling a demurrer to a complaint and not on an order granting summary judgment where the court went beyond the mere allegations contained in the pleadings. *Cf. Gilmore v. Ivey,* _____ S. C. _____ , 348 S. E.

(2d) 180 (Ct. App. 1986) (an outrage action in which the grant of summary judgment in the defendant chiropractor's favor was reversed and the case was remanded to circuit court where a material allegation of the complaint was not controverted by the deposition and exhibit relied on by the chiropractor).

The hearing judge, therefore, properly granted Hunt & Co. summary judgment on McLendon's cause of action alleging intentional infliction of emotional distress.

### III.

During oral argument before this court, McLendon abandoned his appeal from the hearing judge's grant of summary judgment to Hunt & Co. on his cause of action for fraud. We therefore do not address McLendon's contentions concerning this cause of action.

### IV.

The hearing judge ruled that McLendon's cause of action for violation of the South Carolina Unfair Trade Practices Act was barred by the three-year statute of limitations prescribed by the Act. *See* Code of Laws of South Carolina § 39-5-150 (1976). McLendon appeals this ruling.

McLendon does not appeal, however, the hearing judge's alternative holding that no cause of action was stated under the Act.

An alternative ruling of a lower court that is not excepted to constitutes a basis for affirming the lower court and is not reviewable on appeal. *Kolb v. Cook*, 284 S. C. 598, 327 S. E. (2d) 379 (Ct. App. 1985). Thus, the hearing judge's ruling on this issue is the law of the case and we decline to address the statute of limitations question. *See Cooper v. Tindall*, 267 S. C. 196, 226 S. E. (2d) 888 (1976).

### V.

Finally, McLendon argues that the hearing judge abused his discretion in refusing to consider an affidavit from Wellman that McLendon offered on the first day of a two-day hearing. The hearing judge refused to consider the affidavit because it was not timely served on Hunt & Co.

Rule 44(c) of the Circuit Court Rules provides that an adverse party may serve opposing affidavits "prior to the day of hearing." McLendon contends that, because the hearing lasted two days, his service of the affidavit on the first day of the hearing was timely and the hearing judge erred in refusing to consider it. This contention lacks merit.

The fact that the hearing on the motion for summary judgment ran over into another day was of no consequence and did not constitute a fortuitous circumstance allowing for the service of an otherwise late affidavit. To warrant consideration, an affidavit must be served on the opposing party no later than the day before the start of the hearing. *Cf. State v. Hamilton*, 628 S. W. (2d) 742 (Tenn. Cr. App. 1981) (the term "prior to trial," in a rule requiring that a motion to suppress be made prior to trial, means sometimes earlier than the day of the trial).

The hearing judge, therefore, properly refused to consider Wellman's affidavit.

Affirmed in part and reversed in part.

GARDNER, J., and MENDENHALL, Acting J., concur.