THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR. 
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 

 
 
 
 Scott Unger, a New York Individual; Mitchell Realty, Inc., a South Carolina Corporation; and 
 Craftmasters General Contractors, Inc., a South Carolina Corporation, Appellants/Respondents,
 
 
 

v.

 
 
 
 Theodore Leviton, a New York Individual; Fountainbrook Associates, LLC, a South Carolina 
 Corporation; and Grand South Bank, a South Carolina Banking Institution, Defendants,
 Of Whom Theodore Leviton, a New York Individual and Fountainbrook Associates, LLC, 
 a South Carolina Corporation are the Respondents/Appellants.
 
 
 

Appeal from Laurens County
 James W. Johnson, Jr., Circuit Court Judge

Unpublished Opinion No. 2006-UP-130
Heard February 8, 2006  Filed March 8, 2006

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

 
 
 
 J. Stephen Welch, of Greenwood; John S. Nichols, of Columbia, for Appellants/Respondents.
 James E. Bryan, Jr. and Thomas J. Thompson, of Laurens, for Respondents/Appellants.
 
 
 

PER CURIAM:  Scott Unger, Mitchell Realty, and Craftmasters General Contractors appeal the grant of summary judgment on various contractual actions against Theodore Leviton and Fountainbrook Associates arising out of a failed business relationship.  Leviton and Fountainbrook cross-appeal contempt findings and sanctions issued against them in a related proceeding.  We affirm in part, reverse in part, and remand.
FACTS
In 1995, Scott Unger, a New York resident, signed a contract with an entity called HeadSouth to build houses in the Fountainbrook subdivision (the subdivision) in Laurens County, South Carolina.  The subdivision property belonged to Eric Hedrick, the sole shareholder of HeadSouth.  
Hedrick later experienced financial problems and was unable to continue developing the subdivision.  Unger then approached Theodore Leviton, also of New York, to see if Leviton would invest in the project.  Together, Unger and Leviton traveled to South Carolina to view the project site. 
Leviton apparently agreed to participate in the project and formed Fountainbrook, Inc., (the Corporation), which was to hold certain properties that were deeded to it.  Hedrick, with Levitons assistance, formed VAE, Inc.  Concurrently with the formation of the Corporation and VAE, Leviton and Hedrick formed Fountainbrook Associates, LLC (the LLC), giving 65 per cent of the ownership of this entity to the Corporation and the remaining 35 per cent to VAE.  On or about April 5, 1996, HeadSouth conveyed two parcels of real estate to the Corporation. Both properties either adjoined or were close to the subdivision.
Soon after the formation of the LLC, Unger formed Craftmasters General Contractors, Inc. (Craftmasters), of which he became president and sole shareholder.  Craftmasters became the general contractor for the subdivision, supervising the building of the infrastructure.  Craftmasters also had the opportunity to bid on infrastructure projects and was awarded a project if it was the lowest bidder.  Later, Craftmasters received the exclusive right to construct residences in the subdivision.
In addition, Leviton, Unger, and Hedrick agreed to form Mitchell Realty, Inc., (Mitchell) of which, at the time of this litigation, Unger was the sole shareholder.[1]  Sometime during 1996, Mitchell executed an undated written agreement with all home builders selected by [the LLC] to build in their Fountainbrook subdivision.  The agreement further provided that Mitchell would be the exclusive on site marketing agent for the subdivision.  The agreement was signed by Unger in his capacity as president of Mitchell, Leviton in his capacity as managing partner of the LLC; and a representative of a construction company not involved in this litigation.  It was to last 36 months and was renewable for additional twelve-month periods.  
Unger maintained that, pursuant to an oral agreement he made with Leviton, he was to receive a half interest in the Corporation in exchange for his time, services, and expertise in managing the subdivision.  Leviton, however, contended he agreed to share the profits with Unger at an undetermined percentage only after completion of the subdivision and provided Unger had performed properly.
Leviton, his wife, and Gloria Brill were owners of MacLeben Associates, LLC.  Around the same time as the subdivision was being developed, MacLeben bought real property to be held by Hewlett Associates, LLC, and Glen Oaks Associates, LLC.  Although there is no written documentation that Unger had any ownership interests in Hewlett or Glen Oaks or provided capital for the benefit of these entities, Unger testified he contributed his time and expertise to the development of these properties with the understanding that he would receive an ownership interest in each of the projects. 
Mitchell, Craftmasters, and the LLC used the same office complex until 2000, when Leviton ended his business relationships with Unger and forced Mitchell, Craftmasters, and Unger out of the complex. 
On June 22, 2000, Unger, Mitchell Realty, and Craftmasters (collectively referred to as Plaintiffs) brought suit against Leviton and the LLC (collectively referred to as Defendants) alleging sixteen causes of action arising out of the aborted business relationship and requesting actual and punitive damages as well as injunctive relief.  Defendants answered and counterclaimed, and Plaintiffs filed replies.
After the parties completed discovery, Defendants moved for summary judgment.  The trial court heard the matter on August 19, 2002.  While the summary judgment motion was under advisement, the trial court signed a consent order in which the parties agreed that Defendants would follow certain procedures when selling the subdivision property.  The procedures included providing the Plaintiffs with accountings and depositing certain funds into an account held by the Clerk of Court for Laurens County pending final disposition of the case.
On June 12, 2003,[2] the trial court signed an order granting Leviton summary judgment on four causes of action for breach of contract, two actions for tortious interference with contracts, and two claims for intentional interference with prospective contractual relations.[3]  The same day, the trial court also issued a contempt order against Defendants, finding they failed to give an accounting to Plaintiffs as required by prior order and ordering Defendants to pay Plaintiffs $2,000 as a sanction for noncompliance.  After Defendants unsuccessfully moved for reconsideration, both parties appealed.
LAW/ANALYSIS
1.  Plaintiffs contend the trial court erred in finding the purported agreement between the LLC and Mitchell was unenforceable against the LLC.  We find no reversible error.
A contract exists where there is an agreement between two or more persons upon sufficient consideration either to do or not to do a particular act.  The essentials of a contract include an offer and acceptance.[4]  
Plaintiffs based this breach of contract claim on two listing agreements signed by Leviton as managing partner for the LLC, by Unger, for Mitchell Realty, and by a third party representing the builders.  Both agreements were effective for a period of thirty-six (36) months from the date of execution of this contract and were renewable for additional twelve (12) month periods.  Neither agreement, however, was dated, and there is no evidence that either agreement was ever renewed.  
The trial court found the listing agreements were deficient in several respects to fulfill the requirements of a contractual obligation between Mitchell and the LLC.  First, based on its interpretation of the language of the agreements, the court concluded they contemplated future arrangements between Mitchell and home builders selected by [the LLC].  Second, the court noted the agreements contained no provision(s) obligating [the LLC] to Mitchell.  Third, the court found no listing agreements were in existence at the critical time.
We have found nothing in Plaintiffs appellants brief challenging the trial courts finding that the listing agreements on which they based their contract claim were not in existence.[5]  Absent such a challenge, we hold this unappealed finding is a sufficient basis to affirm the grant of summary judgment on this cause of action.[6]
2.  We agree, however, with Plaintiffs contention that the trial court erred in granting summary judgment on their action for breach of contract between the LLC and Craftmasters.
The trial court cited the following reasons to support its grant of summary judgment on this claim:  Plaintiffs inability to state with any degree of certainty their damages flowing from the alleged breach of contract by [the LLC]; Plaintiffs uncertainty as to which Defendant was a party to the alleged contract; and the alleged Contract is in violation of the Statute of Frauds.
As to damages, Plaintiffs presented a letter from Ungers accountant to Leviton stating that Craftmasters was owed $196,830.  Leviton signed the letter as manager of the LLC, confirming it was in agreement with his records.  Without explanation, the trial court stated it was unconvinced that this letter constitutes sufficient proof of damages.  
We, however, find otherwise.  At the summary judgment stage of the proceedings, the nonmoving party need only submit a scintilla of evidence warranting determination by a jury for summary judgment to be denied.[7]  Moreover, as the supreme court has noted,  [t]he law does not require absolute certainty of data upon which lost profits are to be estimated, but all that is required is such reasonable certainty that damages may not be based wholly upon speculation or conjecture. [8]
We also agree with Plaintiffs that the trial court erred in finding the contract was required to be in writing pursuant to the Statute of Frauds.
The statute of frauds requires a contract that is not to be performed within a year of the making to be in writing.[9]  Nevertheless, [t]he fact that performance within a year is highly improbable or not expected by the parties does not bring a contract within the scope of this clause.[10]  Moreover, a trial court should submit an issue concerning the statute of frauds to the jury if there is evidence on which a finding either way might reasonably be made.[11]  
 Here, the alleged contract was for Craftmasters to oversee and manage the subdivision.  In their pleadings, Plaintiffs alleged Craftmasters duties included various general duties related to the development of the subdivision.  Although the parties may have contemplated that performance would take longer than a year, it was nevertheless possible that the work could be completed within a year or that the project would be abandoned within that time.  Under either of these scenarios, Craftmasters and the LLC could both perform their obligations within a year; therefore, the statute of frauds would not bar enforcement of their agreement.
Finally, we disagree with the trial courts determination that Plaintiffs were uncertain as to whether the alleged Contract was between Craftmasters and Leviton or Craftmasters and [the LLC].  In his deposition, Unger stated the agreement was with the LLC assuming that [Leviton] is representing them.  Unger also stated Leviton personally guaranteed in the beginning of the project that he will cover all expenses.  Furthermore, Leviton himself acknowledged that he and Unger agreed Craftmasters would act as the general contractor on the entire development and that sometime later he agreed not to look for any other builders.  We hold this evidence, when viewed in the light most favorable to Plaintiffs, creates an issue of fact as to whether Craftmasters had an agreement with either Leviton or the LLC or both defendants.
3.  Plaintiffs further argue the trial court erred in granting summary judgment on their cause of action for breach of contract arising from Levitons refusal to convey an ownership interest in the Corporation to Unger.  We reject this contention.  
The trial court determined any alleged agreement between Unger and Leviton for an equity interest in the Corporation was unenforceable as a matter of law because it was not in writingas required by statute when it was purportedly executedand because it was barred by the doctrine of judicial estoppel based on an inconsistent statement Unger made during another lawsuit.  We affirm the grant of summary judgment on this cause of action, finding no reversible in the trial courts application of judicial estoppel.[12]
In Cothran v. Brown, the supreme court adopted the following requirements for the application of judicial estoppel:

 (1) two inconsistent positions taken by the same party or parties in privity with one another; (2) the positions must be taken in the same or related proceedings involving the same party or parties in privity with each other; (3) the party taking the position must have been successful in maintaining that position and have received some benefit; (4) the inconsistency must be part of an intentional effort to mislead the court; and (5) the two positions must be totally inconsistent.[13]

The inconsistent position on which the trial court based its determination that judicial estoppel barred this claim came from a 1998 deposition Unger gave in a 1997 lawsuit in which the LLC, HeadSouth, Craftmasters, Unger, Hedrick, and Leviton were named as defendants. In the deposition, Unger testified he had no interest in either the LLC or the entity which has an interest in  [the LLC].  In an affidavit submitted in the present case, Unger maintained he disavowed any ownership interest in either the LLC or the Corporation based on Mr. Levitons insistence and [his attorneys] advise.
The trial court found as a matter of law (1) the earlier litigation was related to the present case in that both involved claims by Unger; (2) Unger received a benefit from taking the position he asserted in the prior litigation; (3) Unger admit[ted] that he intentionally lied during the course of his Deposition relative to the [prior case] and therefore it is clear that Unger clearly intended to mislead the Court; and (4) Ungers position in the prior lawsuit regarding his ownership interest in the Corporation was totally inconsistent with his position in the present matter.
In disputing the trial courts finding that the two lawsuits were related for the purpose of applying judicial estoppel, Plaintiffs argue only the following:

 [T]he alleged inconsistent position was not taken in the same or related proceedings involving the same party or parties in privity with each other, so the testimony did not give rise to a judicial estoppel.  Although both actions may have dealt with issues relative to the Subdivision, the actions did not have the relation contemplated by the doctrine of judicial doctrine estoppel. 

This argument offers nothing by way of explanation of the pertinent facts or supporting authority as to why the trial court was incorrect in finding that the proceedings were related.  It is not this courts responsibility to ferret out the facts from the record or to find the authority to support an appellants contentions.[14]  
As to the requirement that the prior proceeding involve the same party or parties in privity with each other, Unger argues only that the plaintiff in the prior litigation was not connected with any of the parties in the present lawsuit.  There is no requirement, however, that the prior litigation be restricted to those parties in the present case.  Rather, privity is required only between the party against whom the doctrine of judicial estoppel is asserted and the party who made the inconsistent statement in the prior proceeding.[15]
Plaintiffs further argue that Unger has received no benefit because both he and Leviton were defendants in the earlier case.  This argument, however, does not discredit the trial courts findings that Unger was successful in the prior lawsuit in that the case was dismissed and no judgment was taken against either Unger or Craftmasters.[16]
Finally, Plaintiffs contend Leviton should not be allowed to assert the doctrine of judicial estoppel because of his own misconduct in instructing Unger to give an untruthful answer during the deposition.  The trial court did not address this argument, and the record does not indicate Plaintiffs moved for a post-trial ruling on the matter; therefore, we hold Plaintiffs have not preserved this argument for appeal.[17]
4.  Plaintiffs further contend the trial court erred in summarily dismissing their claim for breach of contract arising out of an alleged oral agreement by Leviton to convey Unger ownership interests in Hewlett Associates and Glen Oaks.  We hold summary judgment on this cause of action was premature.
The trial court found that, when the parties allegedly made the agreement, it was not enforceable under then-existing South Carolina Code section 36-8-319 because it was not in writing.[18]  
We do not necessarily accept Plaintiffs contention that, because the present version of section 36-8-103 classifies a limited liability company as a security under only very limited circumstances, the transaction at issue was not subject to section 36-8-319.[19]  Nevertheless, Plaintiffs correctly argue the entities at issue here are both limited liability companies, which, under the law in effect at the time of the agreement would be securities subject to section 36-8-319 only if accompanied by other criteria, none of which were shown to be applicable here.[20]  We therefore reverse the grant of summary judgment on this cause of action and remand the claim for a determination of whether Unger and Leviton had an agreement regarding the transfer of interests in the Hewlett and Glen Oaks properties.
5.  We reject Plaintiffs arguments concerning summary judgment on their causes of action for tortious interference with Craftmasters contract with Grand South Bank, which financed the project, and Mitchells contracts with various builders and realtors.  
 The elements of a cause of action for tortious interference with contract are:  (1) existence of a valid contract; (2) the wrongdoers knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages.[21]
As to Craftmasters contract with Grand South, the trial court found (1) Plaintiffs did not identify any particular contractual arrangements between themselves and the bank; and (2) Plaintiffs failed to provide evidence of any actions or inactions by Defendants that could have amounted to interference with any such arrangements.  
Assuming without deciding that Craftmasters had an existing arrangement for financing with Grand South, we agree with the trial court that Plaintiffs failed to provide evidence of any acts or misconduct by Defendants that could rise to the level of tortious interference with this contract.  In their appellants brief, Plaintiffs assert Defendants encouraged Craftmasters to use the loan proceeds obtained from the bank for the general development of [the LLC], based upon . . . [D]efendants promise to quickly repay the funds so that they could be used on the original lots identified under the contracts with the Bank.  They further maintain Defendants then refused to repay the funds as agreed, and then encouraged the Bank to pursue breach of contract claims in the hope of damaging Plaintiffs and forcing Craftmasters and Unger out of the project.
Here, however, the party purportedly in breach was Craftmasters, not Grand South Bank.  These accusations, then, even if true, do not entitle Plaintiffs to sue for tortious interference with contract.[22]  
As to contracts Mitchell may have had with various builders and realtors, we find no reason to reverse the trial courts finding that Plaintiffs failed to provide evidence that any such agreements existed.  In their appellants brief, Plaintiffs argue only that they alleged in their complaint that Leviton and the LLC were aware of certain contractual relationships between [Mitchell] and other builders and realtors in the area related to the Fountainbrook Development; however, they never cited any evidence supporting this allegation or identified any of the other parties to the purported contracts.[23]
6.  Plaintiffs further contend the trial court should not have granted summary judgment on their cause of action for intentional interference with prospective contractual relations between Mitchell and various third parties.  We find no error.  
To recover on a cause of action for intentional interference with prospective contractual relations, . . . the plaintiff must prove: (1) the defendant intentionally interfered with the plaintiffs potential contractual relations; (2) for an improper purpose or by improper methods; (3) causing injury to the plaintiff.[24]  The plaintiff must actually demonstrate, at the outset, that he had a truly prospective (or potential) contract with a third party.[25]  [P]laintiffs must allege either a business relation with specific third parties or with an identifiable prospective class of third persons. [26] 
In support of its grant to summary judgment on this cause of action, the trial court found Plaintiffs failed to present sufficient evidence to establish a prima facie case.  In addition, the trial court found their request for damages was highly speculative at best, and thus barred by the holding in Hendricks vs. Clemson University.[27]
Plaintiffs argument in their appellants brief focuses on their allegation that Defendants denied them access to information and materials that Mitchell needed to show subdivision property to prospective buyers.[28]  Because, however, Plaintiffs did not challenge the finding that their damages were speculative, we find no reason to reverse the grant of summary judgment.[29]
7.  We also affirm the grant of summary judgment on Plaintiffs cause of action for intentional interference with prospective contracts that Craftmasters had relative to construction in the subdivision.  The trial court found Plaintiffs were unable to identify any potential contracts or parties with whom prospective contracts were pending.  On appeal, Plaintiffs do not point to any evidence in the record that would indicate Craftmasters had any pending sales agreements that would support a cause of action for interference with prospective contractual relations.[30]
8.  Defendants argue the trial court erred in holding Leviton in contempt.  We disagree.
A determination of contempt is within the sound discretion of the trial judge, but is subject to reversal where based on a finding that is without evidentiary support or where there has been an abuse of discretion.[31]  Wilful disobedience of a court order will justify a finding of contempt.[32]  
The trial court found Leviton in contempt because he failed to comply with the provision in the consent order requiring him to provide Unger with accountings of sales proceeds and to follow certain other procedures required of him.  These findings were supported by Ungers testimony that, although he received basic information that potential sales of property in the subdivision were pending, he never received preliminary cost estimates or a full accounting as required by the consent order.  Furthermore, contrary to the terms of the consent order, no money had ever been paid to the Clerk of Court from any of the sales proceeds.  We therefore hold the finding of contempt was supported by the evidence and within the trial courts discretion.
9.  We agree, however, with Defendants that the trial court erred in imposing a $2,000 sanction on Leviton.
Where compensation [for civil contempt] is extended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss.[33]  Included in the actual loss are the costs in defending and enforcing the courts order, including litigation costs and attorneys fees.  The burden of showing what amount, if anything, the complainant is entitled to recover by way of compensation should be on the complainant.[34]
In the present case, the trial court did not specify whether the contempt was civil or criminal.  The fine, however, was payable to Unger; therefore, the sanction was compensatory and accordingly should have been limited to Ungers actual losses.  Because trial court did not make findings of Ungers actual losses, we remand this issue to the trial court to make the necessary findings of fact and to impose a monetary sanction based on Ungers actual losses.  
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.
 GOOLSBY, HUFF, and STILWELL, JJ., concur.

[1]  Although Unger, Leviton, and Hedrick initially agreed that they would each own one third of Mitchells outstanding capital stock, Leviton did not become a stockholder because he lacked a South Carolina real estate brokers license.
[2]  The order indicates it was signed June 12, 2002, which is inconsistent with the fact that the hearing was not until August 2002.  Although the filing date is not legible, Plaintiffs appellants brief indicates the order was signed June 12, 2003.
[3]  The trial court denied summary judgment on four causes of action, and the parties disposed of the remaining causes of action by agreement.
[4]  Benya v. Gamble, 282 S.C. 624, 628, 321 S.E.2d 57, 60 (Ct. App. 1984) (citations omitted).
[5]  The parties appear to agree that Defendants, when moving for summary judgment, never raised the argument that the agreements, by their own terms, had expired in 1999.  Nevertheless, the trial court appeared to rule on the matter by recognizing the fact that no listing agreements were in existence.  It would have been incumbent on the Plaintiffs to argue on appeal that the ruling was factually incorrect or based on procedural irregularity.  See Buckner v. Preferred Mut. Ins. Co., 255 S.C. 159, 161, 177 S.E.2d 544, 544 (1970) (stating an unchallenged ruling, right or wrong, is the law of [the] case and requires affirmance).
[6]  See Folkens v. Hunt, 290 S.C. 194, 205, 348 S.E.2d 839, 846 (Ct. App. 1986) (An alternative ruling of a lower court that is not excepted to constitutes a basis for affirming the lower court and is not reviewable on appeal.).
[7]  Hill v. York County Sheriffs Dept, 313 S.C. 303, 308, 437 S.E.2d 179, 182 (Ct. App. 1993).
[8]  Collins Holding Corp. v. Landrum, 360 S.C. 346, 350, 601 S.E.2d 332, 334 (1994) (quoting South Carolina Fin. Corp. of Anderson v. West Side Fin. Co., 236 S.C. 109, 122-23, 113 S.E.2d 329, 336 (1960)).
[9]  S.C. Code Ann. § 32-3-10(5) (1991).
[10] Roberts v. Gaskins, 327 S.C. 478, 484, 486 S.E.2d 771, 774 (Ct. App. 1997).  
[11] Benya, 282 S.C. at 628-29, 321 S.E.2d at 60.
[12] See Weeks v. McMillan, 291 S.C. 287, 292, 353 S.E.2d 289, 292 (Ct. App. 1987) (Where a decision is based on alternative grounds, either of which independent of the other is sufficient to support it, the decision will not be reversed even if one of the grounds is erroneous.).
[13] 357 S.C. 210, 215-16, 592 S.E.2d 629, 632 (2004).
[14] See First Sav. Bank v. McLean, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (noting that, when an appellant fails to cite any supporting authority or when the argument is merely a conclusory statement, the issue is deemed abandoned on appeal); Smith v. S.C. Dept of Soc. Servs., 284 S.C. 469, 471, 327 S.E.2d 348, 349 (1985) (holding, under prior appellate court rules, the supreme court would not grope in the dark in order to identify errors).
[15] See Whitacre Partnership v. Biosignia, Inc., 591 S.E.2d 870, 894 (N.C. 2004) ([S]o long as the party to be judicially estopped is a privy of the party who made the prior inconsistent statement before a tribunal, due process is not offended by the lack of mutuality of the parties between the two proceedings.).
[16] Because the record and briefs in this case provide little if any information about the prior lawsuit, we are unable to determine what, if any, effect Ungers prior inconsistent statement had on the outcome of that litigation.  See Medlock v. One 1985 Jeep Cherokee 1JCWB7828FT129001, 322 S.C. 127, 132, 470 S.E.2d 373, 376 (1996) (The appellant has the burden of providing this court with a sufficient record upon which to make a decision.).
[17] See Noisette v. Ismail, 304 S.C. 56, 403 S.E.2d 122 (1991) (holding that, when the trial court does not explicitly rule on a question and the appellant fails to move under Rule 59(e), SCRCP, to alter or amend the judgment on that ground, the issue is not properly before the court of appeals and should not be addressed).
[18] Section 36-8-319 provided in pertinent part as follows:

 A contract for the sale of securities is not enforceable by way of action or defense unless
 (a)   there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; 

S.C. Code Ann. § 36-8-319 (1976); see also Davenport v. Island Ford, Lincoln, Mercury, Inc., 320 S.C. 424, 428-29, 465 S.E.2d 737, 740 (Ct. App. 1995) (noting an oral stock purchase agreement would violate section 36-8-319).  The legislature repealed section 36-8-319 in 1999. 1999 S.C. Acts 42 § 4.  
[19] As Defendants point out in their respondents brief, the version cited by Plaintiffs is how the statute presently reads, not how it read in 1998, when the transactions allegedly took place.
[20] According to the South Carolina Reporters Comments to 1976 version of South Carolina Code section 36-8-102:

 The coverage of Article 8s definition of security is not confined to corporate securities, but would include interests in limited partnerships, oil and gas fractional interests, state and municipal bonds, and the like, provided these investment media meet the further requirements of the definition of security, viz. (a) that it is of a type commonly dealt in upon securities exchanges or markets or commonly recognized as an investment medium, (b) is one of, or is divisible into, a class or series of instruments, (c) evidences a share, participation, or interest in property or an enterprise, or evidences an obligation of the issuer, and (d) is issued in bearer or registered form.

[21] Camp v. Springs Mortgage Corp., 310 S.C. 514, 517, 426 S.E.2d 304, 305 (1993).
[22] See Fraidin v. Weitzman, 611 A.2d 1046, 1057 (Md. Ct. App. 1992) (The elements of tortious interference with contract are:  1) existence of a contract between plaintiff and a third party; 2) defendants knowledge of that contract; 3) defendants intentional interference with that contract; 4) breach of that contract by the third party; 5) resulting damages to the plaintiff.) (emphasis added); Beck v. City of Durham, 573 S.E.2d 183, 191 (N.C. Ct. App. 2002) (noting as a element of tortious interference with contract that the defendant intentionally induces the third person not to perform the contract); Restatement (Second) of Torts § 766 (1979) ([O]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other . . . [for] the failure of the third person to perform the contract.).
[23] See SSI Med. Servs. v. Cox, 301 S.C. 493, 497, 392 S.E.2d 789, 792 (1990) (requiring that, in a summary motion, the nonmoving partys response, including affidavits or as otherwise provided by [Rule 56, SCRCP], must set forth specific facts showing there is a genuine issue for trial).
[24] Crandall Corp. v. Navistar Intl Transp. Corp., 302 S.C. 265, 266, 395 S.E.2d 179, 180 (1990).  
[25] United Educ. Distribs., LLC v. Educ. Testing Serv., 350 S.C. 7, 15, 564 S.E.2d 324, 329 (Ct. App. 2002).  
[26] Id. at 16-17, 564 S.E.2d at 329 (quoting Parkway Bank & Trust Co. v. City of Darien, 357 N.E.211, 214 (Ill. App. Ct. 1976)).  
[27] See Hendricks v. Clemson Univ., 339 S.C. 552, 565, 529 S.E.2d 293, 300 (Ct. App. 2000) (finding certain types of damages claimed by the plaintiff to be too speculative to be compensated), revd on other grounds, 353 S.C. 449, 578 S.E.2d 711 (2003).
[28] Plaintiffs argument in their appellants brief reads as follows:  Plaintiffs alleged that the Defendants engaged in actions to prevent Plaintiffs access to records, materials, and supplies [Mitchell] needed to continue the showing of property in Fountainbrook. . . . In his deposition, Leviton admitted that he denied . . . (Unger) access to Fountainbrook.  Although Plaintiffs acknowledge in their appellants brief that a plaintiff must allege either a business relation with specific third parties or with an identifiable prospective class of third persons, they offer nothing in their brief disputing the trial courts finding that they were unable to identify any contracts or parties with which they had prospective business relationships.
[29] See Biales v. Young, 315 S.C. 166, 168-69, 432 S.E.2d 482, 484 (1993) (affirming the trial courts determination of an issue because the appellant failed to appeal the alternative findings given to support it).
[30] See United Educ. Distribs., 350 S.C. at 17, 564 S.E.2d at 330 (The agreement must be a close certainty; thus, a mere offer to sell, for example, does not, by itself, give rise to sufficient legal rights to support a claim of intentional interference with a business relationship.).
[31] Whetstone v. Whetstone, 309 S.C. 227, 233, 420 S.E.2d 877, 880-81 (Ct. App. 1992). 
[32] Id. at 233, 420 S.E.2d at 881.
[33] Cheap-Os Truck Stop, Inc. v. Cloyd, 350 S.C. 596, 606-07, 567 S.E.2d 514, 519 (Ct. App. 2002) (citing United States v. United Mine Workers of Am., 330 U.S. 258, 304-05 (1947)).
[34] Id.